We will hear argument next in No. 21-1226, Gay v. McDonough. Mr. Brown. Good morning, Your Honor. Thank you. May it please the Court? Shirley Gay married Alvin Gay after World War II and remained married to him when he went away to war again, to the Korean War, and then after his return he passed away as a disabled veteran. Mr. Gay sought benefits for hearing loss in his right ear essentially from the 1950s until his death in 2013. Mrs. Gay is now the replacement stand-in claimant and she's been to the Board of Veterans' Appeals, she's been to the Court of Appeals for Veterans' Claims, she's had was denied again at the Board of Veterans' Appeals after the remand, and then the denial at the Board of Veterans' Appeals was affirmed at the Court of Appeals for Veterans' Claims. Essentially our argument has been that during the remands the VA was instructed to get medical opinions about the cause of the veteran's hearing loss, which stems from a lifetime of ear infections with the perforation. Can I just interrupt you? As you know, our jurisdiction is limited to legal questions and your brief, I think rightly, tries to identify a legal question, which as I understand it is that you think as a result of the Supreme Court's decision in the regent's case, the analysis that the Veterans' Court affirming the Board conducted on whether to look at this some factual aspect of catarrhal fever, as one says it, and whether it had an obligation the Board to inquire into that on the facts of this case, or more legally, whether the Robinson standard for defining when such an obligation is triggered is incorrect, particularly as I think you argue now implied by regents. Your Honor, we lost... We don't get to decide the factual or as-applied questions of whether the record really did contain enough evidence to trigger the Robinson standard. I think you are arguing in your blue brief that there's something wrong with the standard that was actually applied, legally wrong, now. Your Honor, actually... Am I doing that right? I don't have... I didn't argue that there was a mistake made at the Court of Appeals for Veterans' Claims in the memorandum decision. My argument was simply that maybe the goalpost got moved by the regent's case and the decision in regents, and the fact that it was decided during that kind of intervening period of time between the issuance of the memorandum decision and our time limit to file a motion to reconsider. Since that case had been decided during that period of time and it came out from the Supreme Court as a slip opinion, I immediately filed the motion to reconsider based on the fact that this decision had been issued by the Supreme Court. Just so I understand it, the only legal contention you're making to us is that if we look at the statute, we will say that the Robinson standard is wrong. Have I misunderstood that? I'm arguing my case by saying that Robinson moved the goalposts. Chief Justice Roberts specifically addressed the issue of a clean slate or a dirty slate. When he said that they're not writing on a clean slate, then an agency has an obligation to look at the issues that are brought up within the record. In this case, what I'm saying is that the catarrhal fever was always in the record. It's in the testimony from the Board of... What difference do you see between the Robinson standard and the words you just used to describe what you take out of Regents? Isn't Robinson itself, doesn't it say the Board's obligation is precisely to attend to both what the claimant has presented, the arguments, and also what is evident from the record? In this case, the Veterans Court affirming the board applied that standard and said on this crucial question of service connection, I'm sorry, of connection of the ear ailment, ear degradation to catarrhal fever, that is not actually apparent from the record. Isn't the Robinson standard essentially the Regent's standard already? I made the argument because the language is different and pursing the language based on the fact that I believe that Chief Justice Roberts broadened what the existing law was by saying simply that they're not writing on a clean slate. If they're not writing on a clean slate, they need to look at what's in the record. I think it gives us one more bite at the apple. What do you think the clean slate or blank slate language means? Well, of course in Regents, the meaning was we once had this policy, we're now changing the policy, and when you change policy A to something else, you have certain obligations to do two things, attend to the fact that policy A had two parts, not one part, and second, that somebody might have relied on policy A. What's the counterpart to the not on a blank slate here since there's no change of policy here? There's no change in policy and there's no reliance. These people didn't give something up because they were following an existing policy. These people have consistently asked for the benefit that they've been asking for. But in this case, I'm just going to the broader language from Chief Justice Roberts where he actually talks about that. Chief Justice Roberts also, he went back to the same case that we briefed for Mrs. Gay, and that's the State Farm case. He's looking at just whether something was entirely overlooked. In this case, the catarrhal fever is not mentioned in the responses to the remand. There's some confusion here because we have lay people from rural Oklahoma talking about a fungal infection that started in the South Seas during World War II. I know I'm getting back to the facts, but the facts showed that he was treated for pneumonia and they called it catarrhal fever. There's testimony in the hearing record, on the first page of the hearing record at page 199 of the appendix, where I think it's the daughter is testifying about the fact that he had pneumonia. He developed a hole in his ear and he's been having drainage ever since. The daughter wasn't alive at the time. This predates the daughter's, and the marriage to the wife hadn't happened for another four years. However, that's the story the family knew. That's the family the story told when they were at the agency level going through their hearing. Then what happened was, on the application for benefits and on the application to reenlist into the military to go to the Korean War, the veteran himself said, I've had weepy ears my whole life. This is a problem that's gone on forever. As we know with the VA, there's two statutes, 38 U.S.C. 1111, 38 U.S.C. 1153. If it's not listed on the initial decision or the initial application to join the military, then it's 1111. That gives the burden shift to the agency. The burden shift to the agency shows the agency has to prove by clear and unmistakable evidence, one, that it didn't preexist or that it did preexist, and two, that there was no aggravation. Under that burden shift, I think they've met their burden shift when they came back and said, look, we went out and hired experts. The experts said that he told us that it preexisted. He said that that was from scarlet fever when he was a child. We also have this testimony and the evidence in the record of him having the catarrhal fever, which the testimony called pneumonia, that caused the hole in the ear to start, from which the weeping became a constant problem. The treatment records show that the treatment started for that in 1947, halfway in between during that break in service. But that doesn't mean that's when it started. The fact that nobody addressed the catarrhal fever and nobody looked at the catarrhal fever is interesting because even at the time, Chief Judge Davis, now Senior Judge Davis, said this is an antiquated term. He put that in a footnote in his memorandum opinion. And I think that the government briefed that, too. In their brief, they actually quote what Chief Judge Davis said about the fact that this is an antiquated term. And the fact that it's an antiquated term, coupled with the fact that it's not mentioned specifically, but the pneumonia is in the testimony and the story that Daddy told the daughter is that it's been in their mind from the start that he got pneumonia in the Navy during World War II, that he was treated, and the records show that. But they didn't call it pneumonia. They called it catarrhal fever. And just as a side note, the treatment notes for the pneumonia do say that a chest x-ray showed that there was inflammation in the lungs at the time that he was treated for the catarrhal fever. One of the problems, sir, with cases like this, which we're now talking about the facts of this case, and your argument is that the CAVC made a mistake when they didn't appreciate what you're saying, when they concluded that the catarrhal condition, that there was no, not apparent in the record that that had led to his hearing loss. So it's, I've said it once or twice before at a council like you, if you don't win at this court, it's because you didn't have a legal argument. As the conversation you had with the presiding judge, which was, isn't Robinson really giving in the veteran setting the degree of review that the Supreme Court required in regents in an APA setting? Because the CAVC does require that issues not raised by the veteran nonetheless have to be looked at if they're apparent. So if this court concludes that you're not going to win on the legal issue, that the standard that was used was, Robinson was wrong, you have to explain to your client that the reason why she didn't prevail is because the CAVC stopped you on the fact issue. I mean, I'm hearing you talking, and if I were a CAVC judge, I might have said, I think you made a good case that there was a sufficient connection between the catarrhal fever and the hearing loss. But by the law, it doesn't allow me to listen to that argument on the facts. Your Honor, I appreciate that fact, and I understand. I think lots of clients, lots of veterans or veteran survivors have trouble appreciating and understanding what the role of this court is in that whole process. As you well know, from your experience, the factual issues that are tied up in assessing veterans' claims are complex. And when Congress created this court, it said, we want the keeper of the fact to be the CAVC, a newly created court that would ride herd on the regional offices and the BVA, the place where you go to say, well, they got the facts wrong. And so that court, over, what, 30 years, 40 years, has developed real expertise in feeling where there are mistakes in facts. This court doesn't have any experience with feeling those factual distinctions. So what you're saying to me in the last four minutes of your argument sounds appealing, but I'm barred by law from ruling in your favor on those grounds. And so my point is, I think it's important for the clients, whether it's a veteran or survivor, to appreciate what the division of authority has been by the Congress in who gets to decide which kind of issue in a veteran's case. Your Honor, I appreciate everything you said. Thank you. And all I would say to that is, if you agree with me that the regent's case moved the goalposts, then I ask for a remand. If the cases say the same thing using different words, then I don't get one, and I understand that. But I'm here to ask you to look at that and purse the language to tell me whether you agree with me that they did move the goalposts. You have used your rebuttal, but we will restore the rebuttal time, but we should hear from the government.  Thank you. Please. Thank you, Judge Taranto. Good morning, and may it please the Court. In the VA disability compensation system, the Department of Veterans Affairs has to review and consider all theories of entitlement that are either expressly raised by the claimant or evident from the record before the department. In this case, the claimant, Mrs. Gay, seems to try to expand that obligation to also include theories of entitlement that are merely possible or conceivable, even though no one expressly raised them, and even though the record does not indicate their viability. Mrs. Gay offers nothing from Title 38 that would support that reading, and in fact, as we point out in our briefing, Title 38 supports the case law as it stands today. Instead, Mrs. Gay only points to the Regents case, a recent Supreme Court decision about the Administrative Procedure Act, and for the reasons we explained, that case really is not very relevant to the issues before the Court. Number one, that is because the Board and the Department of Veterans Affairs more broadly is not directly governed by the Administrative Procedure Act. I think that's clear from both the... Alright, putting that aside. Sure. So that's number one. Number two, Regents dealt with a very specific scenario in which an agency has a policy and then it changes policy, and the change creates reliance interests that the agency then has to account for. That is not the situation here, and I think I heard my friend on the other side just say that there is no change in policy here, there are no reliance interests here, and if that's the case, then Regents is simply inapplicable. You think Regents is limited to change in policy cases? We believe so, Your Honor, yes. Really? Regents specifically dealt with a DHS policy, the DACA policy. Well, I realize that's the setting, but don't you think Regents has a broadcast to a broader audience of APA cases than simply change in policy cases? So, Regents has numerous holdings. The specific point from Regents that we think Mrs. Gay is raising here, we think is in fact limited to change policy. So, for instance, in the Regents case the Supreme Court cited the Encino Motorcars V. Navarro case, which is another APA decision based entirely on an agency changing policy and therefore shifting reliance interests because of that change in policy. So, we think the part of Regents that Mrs. Gay relies on here, that part only applies to a change in policy. And number three, even if the Court were to consider the Regents case, we think the Supreme Court made clear there that no agency has an obligation to... So, you're really arguing that Robinson is much broader than Regents? Robinson from coming up from the CAVC from the Veterans Administration isn't limited to hypothetical that would create a change in condition type setting. You know, where analysis was changed in the process of it. So, you're essentially arguing that Robinson is vastly broader. It's not so much that Robinson is broader. It's more that Robinson deals with... Well, Robinson covers every issue, doesn't it? Every fact issue. It absolutely does. And under the sun. Absolutely. But the standard that the Veterans Court announced in Robinson 1 and that this Court announced in Robinson 2 that standard draws from Title 38. So, it is specific to the Veterans Disability Compensation System. That's not the case for Regents, which deals with the APA more broadly. So, we think the Robinson standard, again, as the Veterans Court announced in Robinson 1 and as this Court adopted in Robinson 2, we think that is the standard that should apply. And under that standard, there is no error here from the Court of Veterans Appeals. Now... I realize that we are limited to legal questions but can you give a little hint about why the references in the record to pneumonia as being A. having been something that Mr. Gay suffered and B. at least testimonial evidence that somebody thought that the future ear problems were related to that. Why that doesn't meet the Robinson standard. Again, I will repeat what Judge Clevenger so well explained. That's not something we can actually decide but I'm curious what your view on that is. Sure. I'm happy to address it. So, I'll start from your last point, Judge Toronto. The testimony that was cited by my colleague on the other side, that testimony we read a little bit different. That is in the context of Mr. Gay's widow and Mr. Gay's daughter making an argument about a unique South Seas fungus that Mr. Gay developed during his service. That's not the same as the catarrhal fever or pneumonia argument, which is slightly different. And on the fungus issue, that South Seas fungus, that is something that the regional office and the board both looked at in depth. Right. I guess I had understood counsel for Mrs. Day to say that there is evidence of pneumonia then called catarrhal fever, then one of the things that fell under the broader category catarrhal fever and also evidence that that pneumonia had something to do with the future ear problems. Did I understand you right just now to say you don't think that second piece is actually in the record? That's exactly right, Your Honor. So there is certainly a record that says Mr. Gay had catarrhal fever, which as we point out, that's simply an old term for a variety of respiratory conditions like pneumonia, but also like the flu or the common cold. While there is a record talking about catarrhal fever, there is nothing in the record to indicate catarrhal fever as a possible theory of entitlement for the specific disability claimed by Mr. Gay and later Mrs. Gay, which is ear damage or hearing loss. There is no inherent connection between the two. And because of that, we think the Veterans Court correctly decided that there is nothing in the record that would trigger a Robinson analysis. And we think that's absolutely correct. But in any event, it's not something we get to decide. That's right. That's right. As this Court made clear in Robinson 2 and the Veterans Court made clear in Robinson 1, the line between what is and is not in the record before the Department, that's a highly factual question that requires a court to look at the specific disability claimed, add the record in the specific case, and then try and figure out in what way those two connect to each other. And that's the kind of analysis that this Court does not have jurisdiction to review under 7292. Suppose for a minute that one understood the Regent's opinion, the relevant section, to have a bearing on situations other than policy changes. Just assume that for purposes of this question. Then do you see any difference between the substance of the Supreme Court opinion's statement of an obligation for an agency to attend to something and what Robinson already requires? There might be a difference. Because again, Robinson really looks specifically to Title 38. So what Robinson says that the Board has to look and the Department more broadly, has to look not only to the arguments made by the claimant, but also to all arguments that are apparent from the record. That goes back to Section 7104 of Title 38, as well as the duty to assist in 5103A. Those are specific provisions within Title 38. We don't think that those provisions and that particular standard would necessarily apply outside of the veteran disability compensation context. Let me... That really wasn't the question as I understood it. The question I understand was whether or not you might take Robinson and go try to apply it someplace else. The question was whether in the veteran setting isn't Robinson basically performing the same function that Regent's provides? You can certainly say that. I hesitate to agree with that fully because again, come from different contexts. They look at different statutes. But you can certainly say that they're consistent with each other. Maybe the following is clarifying. I'm not sure. So I understand that the government doesn't want, to the extent Robinson demands more than the APA, doesn't want us to be saying that Robinson demand for sort of Swiss Monte agency activity is in a carryover to non-Title 38 situations. The question we have here in a way is does the Supreme Court statement of some obligation under the APA, is that possibly more demanding of than Robinson is in the Title 38 context so that if we were inclined to say, yes, we understand the APA is not directly applicable, but in interpreting Title 38, we often look to APA principles. Do you think that the statement in Regent's about an APA principle, if taken outside the change of policy context, demands any more than Robinson already demands in the Title 38 context? We don't think so, Your Honor. There is a long discussion even in the Regent's case itself, talking about how agencies are not obligated to address all conceivable arguments that could have... But there's a distance between all conceivable and that's not an either or thing. Maybe the standard of evident from the record is this is I guess the question, is evident from the record possibly under demanding if you think of the APA principle from Regent's? So evident from the record and again, I know that I've said it before and it may not be entirely responsible. I've repeated myself too, so feel free. Evident from the record is a standard that comes from Title 38. So it is a unique standard announced in Robinson that is specific to the Veterans Disability Compensation System. We think comparing that to Regent's, it's sort of like comparing apples to oranges because they talk about different statutory schemes. Again, I suppose in many ways, they're sort of consistent with each other. I'm not sure if this same situation arose in another agency and another court had to look at it under the APA standard. They're consistent at least in part because the Title 38, what's it, 7261 or something, includes the phrase arbitrary and capricious. It does, but it also includes other standards that are not in the APA. For instance, the clearly erroneous standard. Right, but if arbitrary and capricious as a phrase demands what Regent's says it demands, then absent anything else, it ought to demand the same thing in Title 38. Yes, that's accurate and that's essentially what this court said in Eusebio just recently. Right. But again, I do want to make the assumption that Regent's would apply, but I think it is important to remember the context in which Regent's arose. Right, Regent's is a case in which an agency changed circumstances and that is why the Supreme Court says it has to look to things outside of the record. Specifically, reliance interests that were created by the initial policy. That isn't the case here. Why shouldn't we understand the test in Regent's to be evident from the record? I mean, the problems that the Supreme Court identified in Regent's that were left unattended were evident from the record. You could, but the phrase evident from the record was not. No, no, I understand that, but I mean if we're trying to decide whether you have apples and pears or two different kinds of very closely related apples that both taste the same and look the same, but not exactly the same. Why isn't it safe for our purposes in this court when we're really not responsible for interpreting Regent's for all other agencies and all other purposes? I mean, it's the same to me and Regent's, the problems the Supreme Court had were evident from the record and my goodness, you can't not decide those two issues. So, they sent it back. Well, I certainly disagree. I certainly do not disagree that evident from the record is the appropriate standard and if something is evident from the record, the Department of Veterans Affairs, including the board, does have a responsibility to consider it. Robinson made that clear. If we start talking about what is and is not evident from the record in this case, then we're getting into factual issues over which this court is not interested. Right, when you're looking forward, when other courts have to deal with the question of what Regent's means for run-of-the-mill APA cases, like when the Army Corps of Engineers makes some determinations about whether the egret is being displaced by a road that's coming by and there was a couple of issues that were evident on the record and the Army Corps didn't decide. I mean, what sort of articulation is the government going to advance for how do you apply Regent's in other cases, knowing that all conceivable arguments isn't something that the agency had to address? I think we would stress the limitation that comes out of Regent's context. If you lose in a future case when you try to say, well, Regent's only applies to change in policy cases, then you say, well, how do you articulate the standard for what it is the agency has to look at? How do you come up with a rule? Congress came up with a rule for the VA saying evident from the record. Why wouldn't you advance that in future cases? Those cases would depend entirely on the language of the APA as well as the organic statutes relating to the particular agency in those cases. Presumably, you would fall back on important aspects of the problem. That is one of the standards that the Supreme Court has identified. But, Your Honor, we also cited a case from the Ninth Circuit, the Oregon Resource Defense Council versus Thomas case. I think the court there, and I think it's Judge Kaczynski, does a really good job explaining what the APA does and does not require. It's the idea that when you come to a court and you say something is arbitrary and capricious, you need a hook. You need some other either statute or regulation or policy or guidance, something else that the agency had violated to make it arbitrary and capricious. Arbitrary and capricious does not itself set the substantive standard. It's merely a way of analyzing agency action. You still need to ground it in something. Judge Clevenger, to your question, in a subsequent case in an APA context coming from another agency, that would entirely depend on that hook. I think we would have to look at the APA, look at the agency's organic statute, figure out if there is something arbitrary and capricious there. If there is a change in policy, then we would really look to regents because I don't think it really applies outside of that circumstance. Again, the specific part of regents that has been raised by Mrs. Gay. But we still would look to the organic statute. That's sort of what we're doing here because we have to go back to Title 38. And Title 38 fully supports the standard that was adopted in Robinson. And we think that's the standard that should continue to apply. Thank you for your argument. Thank you. You'll have four minutes if you need it. Thank you, Your Honor. I'll be brief. My argument has been for this appeal that the error was made not in the memorandum opinion of the court, but in its failure to grant my motion to reconsider because of the new precedent from the Supreme Court in the regents case. And I talked about the facts of the case only to lay out what was there because we're talking about is there a clean slate or a dirty slate. So all I was showing was that if there's something on the slate based on Chief Justice Roberts' writing for I think it's a plurality in regents, what he says is if they're not writing on a blank slate then they have a duty. So if they're not writing on a blank slate, there's a duty to look at the record. So in this case my argument is, as I've said already, that using that language, that phrasing written into the opinion of the court broadens the law as it existed at the time of the memorandum opinion. And the fact that it's broadened, that is why our facts, which show the dirty slate, indicate that we're entitled to a remand so that we can then have a decision based on this new law being considered. And the reason I talked about the catarrhal fever is because as everything in the record shows, this is an antiquated term. It's a term that's not used every day. And it's not mentioned anywhere except in the treatment records. So the fact that it's not mentioned in the other medical opinions indicates maybe it wasn't considered. And so in a nutshell that's our argument. If it doesn't move the goal posts, then we lose. If it did move the goal posts then we're entitled to a remand. Just in light of the fact that the law had changed if it moved the goal posts. And I don't think anybody said that yet. I'm ready to conclude. Okay. Thank you so much. The case is submitted. Thank you to all counsel.